**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **NAJIB BABUL,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | **No. 15-2937** |
| **v.** | : | |
| | : | |
| **RELMADA THERAPEUTICS, INC. et al.,** | : | |
| **Defendants.** | : | |

**MCHUGH, J.**                                                   **JANUARY 20, 2016**

### MEMORANDUM

This case arises out of a business relationship that has turned strongly contentious. Plaintiff here was previously the defendant in a case brought by Relmada and its principals.[1] Having prevailed in the earlier action, Dr. Babul now countersues.  Plaintiff's 352-paragraph Complaint paints an elaborate picture of a deliberate scheme to strip Dr. Babul of his interests in his former company, Defendant Relmada Therapeutics, Inc.[2]  Plaintiff pleads that Defendants conspired to remove him from Relmada and brought litigation before this Court in a further effort to defame him and justify their allegedly improper, and as pleaded, illegal actions. Defendants have moved to dismiss all claims.  Viewing the Complaint in the light most favorable to Plaintiff, he has sufficiently pleaded plausible claims of defamation and civil conspiracy, as well as a violation of Pennsylvania's Dragonetti Act.  However, because Plaintiff's allegations are not sufficiently "extreme and outrageous" as those terms are defined in the case law, and because his claim for breach of contract should have been brought during the pendency of the

---

[1] See Relmada Therapuetics, Inc. v. Najib Babul, No. 14-0104 (closed December 3, 2014).

[2] Relmada, Therapeutics Inc., a Delaware corporation, and Relmada Therapeutics, Inc., a Nevada corporation, are collectively referred to as "Relmada," except when it is necessary to distinguish them for purposes of providing background information.

prior litigation before this Court, his claims for intentional infliction of emotional distress (IIED) and breach of contract will be dismissed.

## I.        Relevant Factual and Procedural Background

During argument on Defendants' Motion, I observed that Plaintiff Dr. Najib Babul's 159-page Complaint did not qualify as a "short and plain" statement of the case. See Transcript of October 19, 2015 Oral Argument at 19 (hereinafter, "Argument Transcript"). In response, Plaintiff's counsel fairly emphasized that the length and detail in the Complaint was a deliberate effort to defend against Defendants' impending motions to dismiss given the heightened federal pleading standards imposed by Ashcroft v. Iqbal, 556 U.S. 662 (2009). Argument Transcript at 56. The Complaint recites the factual and procedural background in painstaking detail. For purposes of this Memorandum, the following summary of the key allegations will suffice.

Dr. Babul was involved in Relmada since founding its predecessor, TheraQuest Biosciences, LLC in 2000. Dr. Babul was the majority owner, President, CEO, Chief Scientific Officer, and sole director of TheraQuest. By June of 2011, following the 2008 recession, Dr. Babul's company "had virtually run out of funds," requiring him to secure investors or suitors. Compl. at ¶ 58. On June 30, 2011, the Director of Investment at Laidlaw Corporation ("Laidlaw") contacted Dr. Babul to propose they work together on a transaction. Dr. Babul agreed, and in November 2011, TheraQuest changed its name to Relmada Therapuetics ("Relmada I"), Inc. in anticipation of the corporate transaction proposed by Laidlaw. Dr. Babul then worked on a series of transactions with Defendants Jamess Capital Group, LLC ("Jamess Capital"), Sandesh Seth, and Dr. Sergio Traversa, culminating in a private placement injecting capital into Relmada in April 2012. The April 2012 private placement included "a number of contracts, including an employment agreement for Babul to continue as Relmada's President and

CEO, a Conversion Agreement providing for a warrant allowing Dr. Babul to purchase 8,628,125 shares of common stock in Relmada (the 'Warrant'), an indemnification/advancement agreement, and an Amended and Restated Certificate of Incorporation of Relmada I." Defendants' Motion at 3.  According to moving Defendants, "Dr. Babul went from being the majority shareholder of a company with no money to being a minority shareholder in a company that had money."  Id. at 3–4.  On August 28, 2012, Dr. Babul announced his resignation effective September 28, 2012.  Dr. Babul claims that he resigned after realizing that Seth and Traversa "were untrustworthy and intended to siphon money from Relmada and run it improperly through Laidlaw and Jamess Capital."  Compl. at ¶ 82.

As noted above, this is the second action before this Court involving Plaintiff and the moving Defendants.  In the first action filed on January 9, 2014, Relmada sued Dr. Babul for breach of fiduciary duty following his resignation as President and CEO of the company.  See Relmada Therapuetics, Inc. v. Najib Babul, No. 14-0104-GAM ("the underlying action"). Relmada alleged that Dr. Babul failed to account for $1.5 million in questionable expenses. Plaintiff claims that Defendants brought suit in an effort "to extort Dr. Babul into surrendering his remaining ownership interest in Relmada . . . as well as for their own financial gain which would result from this extortion."  Id. at 32.  On January 29, 2014, Relmada sent Dr. Babul a letter purporting to cancel the Warrant as a result of his alleged breach of fiduciary duty.  In related, concurrent litigation, the Delaware Chancery Court ordered Relmada to advance Dr. Babul's counsel fees and costs in both courts.

As of April 2012, Dr. Babul owned 15,169,608 shares of common stock in Relmada I. Compl. at ¶ 330.  On May 20, 2014, Relmada entered into a transaction ("the Share Exchange") with a publicly traded company that was later renamed Relmada Therapeutics, Inc. (Relmada II),

where shares of Relmada I were exchanged for shares of Relmada II.  Dr. Babul alleges that despite "being the single largest shareholder of Relmada's Common Stock, upon resignation of his employment[,] Relmada cut off Dr. Babul from all information about Relmada, including any information about the Share Exchange.  As a result, Dr. Babul knew nothing about the Share Exchange until his counsel received an email about it [on May 24, 2014]."  Compl. at ¶ 186.  With "the exception of Dr. Babul, the shareholders of Relmada became the controlling stockholders of Relmada II."  Id. at 188.  Relmada's reason for excluding Dr. Babul from the Share Exchange was explained in a May 27, 2014 Form 8-K SEC filing as "the on-going litigation."  Id. at 190.  Dr. Babul avers that Defendants both "orchestrated the reverse merger and share exchange that created Relmada II but excluded Dr. Babul from sharing in the benefits" and canceled the Warrant as part of Defendants' larger scheme of "malicious acts that were designed to punish, intimidate, and harm him."  Id. at 31.

On June 25, 2014, Dr. Babul filed an amended answer and counterclaims in the underlying action.  Dr. Babul's counterclaims consisted of breach of contract and a declaratory judgment, each alleging that Relmada improperly canceled the Warrant in violation of the private placement's Conversion Agreement.  Relmada objected to paying Dr. Babul's fees for prosecution of his counterclaims, arguing that the Delaware Chancery Court's Order was limited to Dr. Babul's fees in defending the underlying action.  Dr. Babul maintained that his counterclaims turned on the same facts alleged in Relmada's Complaint, and Relmada "ultimately conceded."  Compl. at ¶ 250–51.

The underlying action terminated when, according to Plaintiff, Relmada offered to "surrender."  Id. at ¶ 237.  On November 13, 2014, the parties advised this Court "that they were working together to come to an agreement about the terms of a proposed stipulated judgment, not

a settlement, but an order granting Dr. Babul all of the relief to which he would be entitled if the case went all the way through trial and he won on everything." Id. at ¶ 238. After the parties went back and forth regarding Dr. Babul's right to exercise the full amount of the Warrant— declaratory relief sought by his counterclaims—the final Stipulated Judgment Order awarded Dr. Babul complete relief regarding Relmada's claims against him and limited relief on his counterclaims, granting him the right to exercise only half of the Warrant. Relmada has consistently maintained that its decision to settle was purely a "dollar-and-cents decision" to end the underlying action in light of its "ever-increasing" obligation to pay counsel fees pursuant to the Delaware Chancery Court Order. See Defendants' Brief at 12.

During the pendency of the underlying action, Relmada made a series of public statements in filings with the SEC about the litigation. Compl. at ¶ 257. These statements largely consisted of generalities about the underlying action, including Relmada's belief that it had "good grounds for its claims against Mr. Babul." Id. at ¶ 260. On December 9, 2014, following entry of the Stipulated Judgment Order, Relmada filed a Form S-1/A stating that Relmada "dropped its lawsuit" against Dr. Babul and consented to judgment in his favor. The form also repeated Relmada's earlier statements that it had "good grounds for its claims against Mr. Babul and for its defenses against Mr. Babul's claims." Id. at ¶ 262.

On December 31, 2014, following termination of the underlying action, "Relmada's counsel wrote to Dr. Babul's counsel and advised that Relmada was willing to exchange Dr. Babul's shares in [Relmada I] on a 10 to 1 basis for shares in Relmada II." Compl. at ¶ 195. Relmada, through their counsel, advised Dr. Babul that they would provide him with documentation to make the exchange effective, but they never did. At this point, Relmada I shares are "virtually worthless" while Relmada II shares are valuable. Id. at ¶ 336. In addition,

"Defendants Laidlaw and Seth have control over Defendants Jamess Capital and Traversa, and all of them share control over Relmada."  Id. at ¶ 264.

While the preceding details may not appear ominous to the average reader, the Complaint includes many allegations of malicious intent on the part of Defendants.  Thus far, I have presented a fairly sanitized version of the facts as compared to the presentation of facts in Plaintiff's Complaint.  Plaintiff pleads that Defendants conspired to harm him, engaging in a purposeful and vicious scheme in pursuit of depraved, corrupt goals with Dr. Babul—a talented, trustworthy, and innocent scientist—as the unlucky victim.  In the words of Plaintiff's counsel:

> A fair reading of the Complaint is that Defendants Seth and Traversa are ruthless and unscrupulous men who with Defendants Laidlaw and Jamess Capital control Defendants Relmada and Relmada II for the purpose of siphoning cash out of them for their personal benefit.  Complaint ¶ 82.  As the first part of their nefarious and illegal scheme, in 2012 they wrested control of Relmada from Dr. Babul with lies and undue pressure.  Id. at ¶¶ 59–79.  He resigned from his job as President of Relmada in September 2012 upon realizing that he had fallen in with scoundrels.  Id. at ¶¶ 80–98.  They retaliated against him almost right away by claiming that he had failed to disclose certain account facts when in reality he had made a complete disclosure.  Id. at ¶¶ 99–147.  They used lawyers in an attempt to extort him into surrendering his shares of stock in Relmada.  Id. ¶¶ 116, 124–27, 136–47, 171–72.  They filed the underlying litigation for this very purpose. Id. ¶ 32.
>
> As part of their scheme to harm him they committed numerous bizarre and illegal acts.  They made an outrageous and unreasonable demand that he explain over 3,000 separate transactions over the Thanksgiving weekend or be sued, without ever disclosing the list of transactions.  Id. ¶¶ 133–47.  They sent him frightening messages from anonymous email addresses.  Id. ¶¶ 153–55, 175–81.  They claimed that they would cause the IRS to investigate him when they knew he had done nothing wrong.  Id. ¶¶ 171, 173–75.  They stole his stock warrants.  Id. ¶¶ 156–58, 236.  They lied about him in public SEC filings, even after they admitted they had no basis for the statements.  Id.  257–63.  In a continuing attempt to siphon money from Relmada, they put together a share exchange transaction in an attempt to raise public funds and then cheat him out of it.  Id.  ¶¶ 182–97.  They tried to cheat him out of his advancement rights, but his lawyers and the Delaware Chancery Court prevented it.  Id. ¶¶ 248–56.  They concocted a story that "auditors" had discovered that he had incurred $1.5 million in "questionable expenses" and then refused to identify the auditors and admitted in open court that they had nothing but assertion, i.e., no evidence, to support the allegation.  Id. ¶¶

23, 209–17, 224–25.  They stubbornly refused to participate in discovery even when ordered to do so by the Court.  Id. ¶¶ 133, 164–67, 209–17, 226–29, 232–35.

Thanks to the judicial system, Dr. Babul was able to force [Defendants] to back off their scheme to extort and harm him, but unfortunately they did manage to cause him substantial harm.  A Google search for Najib Babul quickly returns stories about how he stole $1.5 million from Relmada, which is a complete and utter lie spread by the [Defendants through the underlying action].  Id. ¶¶ 280–86.  This made it impossible for this brilliant and honest scientist to work in the field of drug development, the profession he chose when he was in his 20s and diligently pursued until [Defendants] ruined him.  Id. ¶¶ 4–7, 51, 289.

Plaintiff's Opposition Brief at 3–4.

The Complaint includes the following five claims: Count I, violation of Pennsylvania's Dragonetti Act, 42 Pa.C.S. § 8351 et seq. for wrongful use of civil proceedings against all Defendants; Count II, defamation against Relmada; Count III, IIED against Relmada; Count IV, Civil Conspiracy, Aiding, and Abetting, and Substantial Participation against Laidlaw, Jamess Capital, Seth, and Traversa; and Count V, breach of contract against Relmada.  Defendants move to dismiss all counts and to strike immaterial and impertinent paragraphs of Plaintiff's Complaint.

## II.    Discussion

Moving Defendants request dismissal pursuant to Fed. R. Civ. P. 12(b)(6).[3]  In analyzing Defendants' Motion, I must assume all of Plaintiff's factual allegations are true, draw all inferences in his favor, "and then determine whether they plausibly give rise to an entitlement for relief."  Connelly v. Steel Valley Sch. Dist., 706 F.3d 209, 212 (3d Cir. 2013), as amended (May 10, 2013) (discussing Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007) and Iqbal, 556 U.S. 662) (internal citations omitted).

---

[3] Defendants Robinson Brog Leinwand Greene Genovese & Gluck P.C., David C. Burger, and David E. Danovich (the "Lawyer Defendants") filed a separate Motion to Dismiss Count I of Plaintiff's Complaint, which is also being denied in a Companion Memorandum Order being filed concurrently with this Memorandum.

I agree with Plaintiff that the primary flaw in Defendants' Motion is that they fail to universally assume the truth of Plaintiff's allegations. <u>See</u> Plaintiff's Opposition Brief at 2. While Defendants make some fairly persuasive arguments, and discovery may in fact support their defenses, at this early stage, all the allegations and inferences drawn therefrom must be interpreted in the light most favorable to Dr. Babul. For the reasons that follow, Defendants' Motion will be granted in part and denied in part.

      *a. Plaintiff's Dragonetti Claim is Plausible*

The moving Defendants contend that Plaintiff's Dragonetti claim fails because Dr. Babul withheld requested financial information from Relmada, giving Defendants probable cause to pursue a breach of fiduciary duty claim in the underlying action. In Pennsylvania, the elements of "a wrongful use of civil proceedings" claim are defined as follows:

> A person who takes part in the procurement, initiation or continuation of civil proceedings against another is subject to liability to the other for wrongful use of civil proceedings: (1) he acts in a grossly negligent manner or without probable cause and primarily for a purpose other than that of securing the proper discovery, joinder of parties or adjudication of the claim in which the proceedings are based; and (2) the proceedings have terminated in favor of the person against whom they are brought.

42 Pa.C.S.A. § 8351(a).

Defendants argue that Dr. Babul has failed to plausibly allege that Relmada lacked probable cause at the time of Relmada's Complaint in the underlying action, because Dr. Babul had not accounted for a number of questionable transactions. Specifically, Defendants maintain that Dr. Babul had a contractual and fiduciary duty to account for these expenses, and he failed to do so, giving rise to the breach of fiduciary duty claim. Defendants emphasize that Dr. Babul concedes that he took it upon himself to dictate what accounting records to produce and withhold, even expressly telling his accountant to withhold information at one point.

Plaintiff counters that the pleadings include ample allegations that Defendants lacked probable cause to pursue the underlying action and acted for an improper purpose, culminating in their complete "surrender."  Plaintiff specifically pleads that Defendants jointly decided to threaten Dr. Babul with "a trumped up lawsuit as a means of forcing him to give up the remainder of his ownership interest in Relmada."  Compl. at ¶ 123.  During argument, the Court pressed Plaintiff's counsel regarding Dr. Babul's failure to supply affirmative proof that certain expenses were appropriate in response to Defendants' demand letters (preceding suit), implying that such a failure could amount to probable cause to bring suit under the circumstances.  An excerpt from that exchange follows:

> [PLAINTIFF'S COUNSEL]: I contend that the second and third demand letters were a setup and a fraud and that everything about them was fraudulent and designed to shake him down.

> THE COURT: Shake him down?

> [PLAINTIFF'S COUNSEL]: By asking him to settle, by chipping in – throwing in his shares of stock.  They were trying to get his ownership of the company.  We know that because that's exactly what they asked for once they got into the litigation and after we got some very bizarre, threatening email messages.  They said, why don't you just turn in all your shares?  That was their settlement demand.  They had asked him to discuss settlement in early [December], after he got that November 27th letter, and that's precisely what they had in mind at that time. . . .

> THE COURT: Is it improper for a corporation that's about to do a public offering to request that a prior owner, who was a CEO, basically account for expenditures when an outside auditing firm has said, we would like some documentation of the propriety of the expense?  How is that improper for a corporation that's about to undertake a public offering?

> [PLAINTIFF'S COUNSEL]: Hypothetically, that's not – hypothetically, it would be fine to do.  That's not what happened here, however.

> THE COURT: So [your] argument would be that there's a – a separate motive that you intend to prove if the case goes ahead, to show that it was not for the transparent legitimate purposes of the public offering but, rather, for nefarious purposes of stripping your client of his investment?  Is that your position?

[PLAINTIFF'S COUNSEL]: Yes, Your Honor.  And I think, actually, just the evidence that I've alleged – I expect there will be more, but just the evidence we've alleged in the Complaint would prove that nicely.

Argument Transcript at 17–19.

Dr. Babul further counters that he made a full disclosure of accounting information to Seth and Traversa in 2012, and he later spent a large amount of time responding to Defendants' accounting inquiries until he realized he was "being set up" in December 2013.  Plaintiff's Opposition Brief at 13–14.  Plaintiff also emphasizes that once he sought explanations for the underlying action through the discovery process, it became clear Defendants' true motive was to pressure and intimidate him.

Based on these allegations, the pleadings sufficiently aver that Defendants lacked probable cause and acted for an improper purpose.  Of particular importance is Plaintiff's allegation that even prior to commencement of the underlying action, Defendants would have dropped the suit altogether had Dr. Babul agreed to surrender his interests in Relmada.  I recognize that Plaintiff will have a heavy lift in establishing evidence to prevail on this claim, but the controlling pleading standard is plausibility—not probability—and I agree with Plaintiff that his well-pleaded Complaint includes more than enough allegations of malicious intent.  See Twombly, 550 U.S. at 557.

### b. *Plaintiff's Defamation Claim Also Survives*

Defendants argue that Dr. Babul's defamation claim fails because all the challenged statements were privileged, true, or not defamatory as a matter of law.  Defendants also argue that the SEC filings express statements of opinion, which are not defamatory in nature (*e.g.*, Relmada's belief that it had "good grounds" and a "strong basis" for the underlying action).  Finally, Defendants contend that the SEC filings provide required information for publicly traded

10

companies in order to enable investors to make informed decisions, resulting in conditional privilege treatment under the law.  See Elia v. Erie Ins. Exch., 634 A.2d 657, 660 (Pa. Super. Ct. 1993).

Plaintiff responds that the SEC statements were presented either as facts or as opinions that imply the existence of undisclosed defamatory facts.  For instance, Relmada repeatedly reported to the SEC that it engaged in an audit and uncovered the $1.5 million of questionable expenses incurred by Dr. Babul.  "Any reasonable reader of that statement would understand that to mean that there was an audit report and findings that Dr. Babul incurred $1.5M in questionable expenses.  But there was no such report or findings, as discovered in the underlying litigation.  Relmada had no evidence, only assertion to support its claim."  Plaintiff's Opposition Brief at 16.

While Defendants continue to make compelling arguments here, I am again convinced that the pleadings withstand their challenges.  I agree with Plaintiff that the SEC statements at issue imply the existence of undisclosed facts, which makes them actionable regardless of whether they are framed as opinions.  See Braig v. Field Commc'ns, 456 A.2d 1366, 1372 (Pa. Super. Ct. 1983) ("A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion.") (quoting Section 566 of the Restatement (Second) of Torts (1977)).  Further, construing the Complaint in the light most favorable to Plaintiff, it can be logically inferred from the totality of the allegations that the statements to the SEC were not only false, but intentionally false and made with ill-intent as part of a series of improper actions that Defendants committed in pursuit of shared illegitimate goals.

Regarding Defendants' conditional privilege argument, I agree that Relmada had a responsibility to disclose information about the lawsuit to the SEC.  However, I also agree with Plaintiff that conditional privileges have become superfluous in this context because a showing of negligence is, on the one hand, required for a private plaintiff to prove a defamation claim, and sufficient for a plaintiff to overcome the conditional privilege under Pennsylvania state law on the other.  See Am. Future Sys., Inc. v. Better Bus. Bureau of E. Pennsylvania, 592 Pa. 66, 81, 923 A.2d 389, 398 (2007) ("Logically, then-and as suggested above in relation to [the doctrine of conditional privilege]—this renders the former concept of a conditionally privileged occasion embodying the negligence standard superfluous in the present era.").  Moreover, even if I were to apply conditional privilege, Plaintiff's allegations that defamatory and false statements were made purposefully with ill-intent as part of a larger scheme is enough to overcome the privilege.  See Plaintiff's Opposition Brief at 17 ("Dr. Babul's factual allegations clearly plead intentional conduct so any privilege is of no moment.").

During argument, I commented on the apparent connection between Plaintiff's Dragonetti and defamation claims.[4]  In my view, Plaintiff's "defamation claim very much

---

[4] The Court's exchange with counsel regarding whether dismissal of Plaintiff's Dragonetti claim would require dismissal of his defamation claim follows:

THE COURT: If Relmada was warranted in bringing the claim that it brought against your client, would it not also be warranted in reporting to the SEC the existence of that litigation?  Am I wrong about that? . . . They [have an obligation] in the SEC filings to both disclose and discuss the litigation; do they not?

[PLAINTIFF'S COUNSEL]: They do, Your Honor.  Yes, that's true.

THE COURT: Right.  And so if the litigation is not brought in bad faith, are they not, in a sense, then compelled to discuss that litigation in the SEC forum?

[PLAINTIFF'S COUNSEL]: Yes, Your Honor.  And if I – if I contended that they were at least negligent – in bringing that, I could go forward with a defamation claim.  But if I couldn't establish at least negligence, then I'd be out of luck. . . . Private plaintiff in a defamation case has to establish at least negligence.  That's the same thing [that] defeats the conditional privilege.

THE COURT: Right.

[depends] upon the viability of the Dragonetti claim." Argument Transcript at 46. Stated differently, if Defendants had probable cause to initiate the underlying action and brought suit in good faith, their related statements to the SEC would constitute required corporate disclosures about the lawsuit, and could not form the basis for a defamation claim. As the Complaint stands, however, Plaintiff pleads that the underlying action and related statements to the SEC were made in a deliberate effort to harm Dr. Babul. Discovery will surely test the viability of both claims, and Defendants might be reasserting these same arguments at summary judgment, but at this preliminary juncture, Plaintiff's pleadings are sufficient to withstand Defendants' Motion as to defamation.

       c.  *Plaintiff's Allegations Are Not Sufficiently Extreme and Outrageous to Establish IIED Liability*

In pleading his IIED claim, Plaintiff characterizes Defendants' alleged conduct as extreme and outrageous. Because Defendants successfully argue that their alleged conduct does not rise to the rigorous level of "extreme and outrageous" required under Pennsylvania law to sustain an IIED claim, I will grant Defendants' Motion as to Count III of Plaintiff's Complaint.

IIED liability requires the intentional or reckless infliction of "extreme and outrageous conduct" such that it "causes severe emotional distress to another" or bodily harm. Hoy v. Angelone, 554 Pa. 134, 150, 720 A.2d 745, 753 (1998). The level of outrageousness required to support a claim is extraordinarily high.

> [O]ur Superior Court has noted, "the conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to

---

[PLAINTIFF'S COUNSEL]: So . . . if I could contend that they were at least negligent, whereas to prevail in the Dragonetti claim, I have to prove that they were without probable cause and grossly negligent.

THE COURT: So [you] would rest on that distinction.

Argument Transcript at 46–48.

be regarded as atrocious, and utterly intolerable in a civilized society." Buczek v. First National Bank of Mifflintown, 366 Pa. Super. 551, 558, 531 A.2d 1122, 1125 (1987). Described another way, "[i]t has not been enough that the defendant has acted with intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation that would entitle the plaintiff to punitive damages for another tort." Restatement (Second) of Torts § 46, comment d; Daughen v. Fox, 372 Pa. Super. 405, 412, 539 A.2d 858, 861 (1988).

Id. at 151.

In opposing Defendants' Motion, Plaintiff argues that Defendants' actions in allegedly sending "anonymous threats from phony email accounts" and threatening a "trumped up criminal referral to the Internal Revenue Service," together with Defendants' filing of a baseless civil lawsuit in an effort to defame Dr. Babul and coerce him to give up his equity interest in Relmada, qualify as "extreme and outrageous." Plaintiff's Opposition Brief at 19. Although I agree that Plaintiff's allegations about Defendants' scheme to harm him sound malicious, offensive, and even shocking as those terms are used colloquially, Defendants' alleged conduct still does not rise to the level of "extreme and outrageous" that has evolved in Pennsylvania case law.[5] In viewing the Complaint in the light most favorable to Plaintiff, he simply has not alleged facts that "go beyond all bounds of human decency." At most, Defendants' offenses could give rise to limited criminal liability, which alone is not enough to sustain an IIED claim. Thus, Plaintiff's claim for IIED will be dismissed.[6]

---

[5] "Examples of such behavior include a driver fatally striking plaintiff's son and, without notifying the authorities, burying the body [in a field;] defendants intentionally falsifying records to implicate plaintiff in a homicide for which plaintiff later went to jail[;] and a doctor telling the press that plaintiff was suffering from a fatal disease when the doctor knew that information was false." Brown v. Udren Law Offices PC, No. 11-2697, 2011 WL 4011411, at *4 (E.D. Pa. Sept. 9, 2011) (citing Papieves v. Lawrence, 437 Pa. 373, 263 A.2d 118 (1970); Banyas v. Lower Bucks Hosp., 437 A.2d 1236 (Pa. Super. Ct. 1986); Chuy v. Eagles Football Club, 595 F.2d 1265 (3d Cir. 1979)).

[6] Plaintiff will not be granted leave to amend his IIED claim at this time, as any amendment would be futile. See Phillips v. Cnty. of Allegheny, 515 F.3d 224, 245 (3d Cir. 2008) ("if a complaint is subject to a Rule 12(b)(6) dismissal, a district court must permit a curative amendment unless such an amendment would be inequitable or futile"). Should discovery reveal additional facts that might rise to the requisite level of "extreme and outrageous," Plaintiff may move for leave to amend his Complaint.

### d. The Complaint Pleads a Plausible Claim of Civil Conspiracy

"The essential elements of a claim for civil conspiracy are as follows: (1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose, (2) an overt act done in pursuance of the common purpose, and (3) actual legal damage." Phillips v. Selig, 959 A.2d 420, 437 (Pa. Super. Ct. 2008).[7] Defendants argue that Dr. Babul failed to identify overt acts done in furtherance of the conspiracy by Laidlaw or Jamess Capital.

Plaintiff counters that Laidlaw and Jamess Capital's overt acts were committed by Seth, chairman of Relmada and Senior Managing Director and Head of Healthcare Investment Banking at Laidlaw, as well as the founder, managing partner and an owner of Jamess Capital. Comp. at ¶ 14. "Companies only act through people, and Seth is the person who acted for Laidlaw and Jamess Capital. . . . The Complaint is replete with allegations about [Seth's] participation in the scheme to extort Dr. Babul into surrendering his share in Relmada and otherwise cause him harm." Plaintiff's Opposition Brief at 21 (citing Compl. at ¶¶ 59–79; 83–91, 122–23).[8]

Accepting the Complaint's factual averments as true, Plaintiff has alleged enough to move forward to discovery on Count IV.

---

[7] Defendants primarily argue that because all of Plaintiff's other claims should be dismissed, dismissal of his civil conspiracy claim logically follows. However, given that Plaintiff's Dragonetti and defamation claims have withstood their Motion to Dismiss, Defendants' primary argument for dismissal of Count IV is no longer relevant.

[8] In response, Defendants argue that "a single entity cannot conspire with itself and similarly, agents of a single entity cannot conspire among themselves." Grose v. Procter & Gamble Paper Products, 866 A.2d 437, 441 (Pa. Super. Ct. 2005). Thus, if "any overt acts committed by Laidlaw and Jamess Capital were committed by Mr. Seth, he could not have conspired with himself, and if these entities 'control' Relmada, they cannot have conspired with Relmada." Defendants' Reply Brief at 10. While I find this argument persuasive, because the Complaint is replete with so many allegations regarding Defendants' improper actions, and often alleges acts done in conjunction with various co-Defendants, as well as known third parties and/or anonymous actors, I cannot conclude at this early stage that Seth essentially acted alone, particularly in viewing the record in the light most favorable to Plaintiff. However, should discovery reveal that Seth was indeed the sole "conspirator," Defendants should reassert this argument at summary judgment.

*e.  Plaintiff's Breach Of Contract Claim is Barred as a Compulsory Counterclaim*

Defendants argue that Dr. Babul's breach of contract claim bears a logical relationship to the claims brought against Dr. Babul in the underlying action, and is therefore barred as a compulsory counterclaim that should have been brought in the prior suit.  I agree.

In the first action before this Court, Relmada sued Dr. Babul for breach of his fiduciary duties.  Dr. Babul counterclaimed for breach of contract, alleging that Relmada improperly canceled the Warrant in violation of the private placement's Conversion Agreement.  Here, Dr. Babul has again filed suit for breach of contract, this time alleging he was improperly excluded from the May 2014 Share Exchange in violation of the Amended and Restated Certificate of Incorporation, which was also executed pursuant to the 2012 private placement.

The plain terms of Fed. R. Civ. P. 13(a) titled "Compulsory Counterclaim" reads, "A pleading must state as a counterclaim any claim that—at the time of its service—the pleader has against an opposing party if the claim: (A) arises out of the transaction or occurrence that is the subject matter of the opposing party's claim; and (B) does not require adding another party over whom the court cannot acquire jurisdiction."  In <u>Transamerica Occidental Life Ins. Co. v. Aviation Office of Am., Inc.</u>, the Third Circuit further defined a compulsory counterclaim as follows:

> For a claim to qualify as a compulsory counterclaim, there need not be precise identity of issues and facts between the claim and the counterclaim; rather, the relevant inquiry is whether the counterclaim "bears a logical relationship to an opposing party's claim."  <u>Xerox Corp. v. SCM Corp.</u>, 576 F.2d 1057, 1059 (3d Cir. 1978).  The concept of a "logical relationship" has been viewed liberally to promote judicial economy.  Thus, a logical relationship between claims exists where separate trials on each of the claims would "involve a substantial duplication of effort and time by the parties and the courts."  <u>Id.</u>  Such a duplication is likely to occur when claims involve the same factual issues, the same factual and legal issues, or are offshoots of the same basic controversy between the parties.  <u>See id.</u>; <u>Great Lakes Corp. v. Herbert Cooper Co.</u>, 286 F.2d 631, 634 (3d Cir.1961).  In short, the objective of Rule 13(a) is to promote

16

judicial economy, so the term "transaction or occurrence" is construed generously
to further this purpose.

292 F.3d 384, 389–90 (3d Cir. 2002).  "A compulsory counterclaim not raised in the first action

is barred in subsequent litigation."  Bristol Farmers Mkt. & Auction Co. v. Arlen Realty & Dev.

Corp., 589 F.2d 1214, 1220 (3d Cir. 1978).  "The requirement that counterclaims arising out of

the same transaction or occurrence as the opposing party's claim 'shall' be stated in the pleadings

was designed to prevent multiplicity of actions and to achieve resolution in a single lawsuit of all

disputes arising out of common matters."  S. Const. Co. v. Pickard, 371 U.S. 57, 60 (1962).

Thus, Rule 13(a) is essentially a rule of judicial economy, aimed to reduce the heavy burden

placed on our judicial system and promote efficiency.

Here, as pleaded in the Complaint, Plaintiff's contract claim under Count V alleges that

Dr. Babul was improperly excluded from participating in the May 2014 Share Exchange.

Plaintiff further pleads that in "a Form 8-K filed with SEC on May 27, 2014, Relmada II stated

that '[d]ue to the ongoing litigation, we have also not exchanged Mr. Babul's equity in Relmada

for our common stock pursuant to the Stock Exchange that closed on May 20, 2014.' "  Compl.

at ¶ 334.  It strikes me as self-evident that if I were tasked with evaluating whether Relmada

breached any contractual obligations by excluding Dr. Babul from the Share Exchange, I would

necessarily have to consider if the facts alleged in the underlying action created a proper basis for

such exclusion.  Thus, the current contract claim is a clear "offshoot of the same basic

controversy between the parties" in the first action.  Transamerica Occidental Life Ins. Co., 292

F.3d at 389–90.

Moreover, Dr. Babul's counterclaim in the underlying action was based on comparable

facts as his current contract claim, and their logical relationship denotes that the claims should

have been brought together.  In the prior suit, Dr. Babul filed counterclaims on June 25, 2014

alleging breach of the private placement's Conversion Agreement based on Relmada's unilateral cancelation of the Warrant.  The Share Exchange closed on May 20, 2014, and Dr. Babul affirmatively pleads that he had notice of the exchange on May 24, 2014.  Compl. at ¶ 186.  Dr. Babul also pleads that his right to participate in the Share Exchange arises out of Relmada's Amended and Restated Certificate of Incorporation, executed in "connection with the April 2012 Private Placement."  Compl. at ¶ 331.  Thus, the face of the Complaint indicates that Dr. Babul's counterclaims in the underlying action involved the same factual and legal issues as his current claim: both contract claims turn on whether Relmada had cause to breach agreements that arose out of the private placement based on Dr. Babul's purported breach of fiduciary duty as alleged in the underlying action.

Plaintiff makes a number of arguments in response.  First, Dr. Babul argues that his counterclaims in the underlying action and current breach of contract claim arise out of "two related but analytically distinct subjects."  Plaintiff's Opposition Brief at 7.  Specifically, regarding the counterclaim in the underlying action, Relmada informed Dr. Babul via letter that it had a right to cancel the Warrant because he breached his fiduciary duties as alleged in their lawsuit.  In contrast, Plaintiff contends that the current pleadings do not allege that Relmada cheated Dr. Babul out of the Share Exchange because of the claims brought against him but rather purely out of spite to punish and harm him.  Plaintiff suggests that Dr. Babul's exclusion from the Share Exchange "had nothing to do with the alleged breach of fiduciary duties.  It had everything to do with [Defendants'] scheme to extort and harm him, which is the subject of the Complaint in this action."  Id.  As aptly stated by Defendants, "Could not the identical argument have been made with respect to the counterclaims that he actually filed?"  Defendants' Reply Brief at 3.  Put differently, Plaintiff does not attempt to distinguish his two contract claims based

on the facts or legal issues involved, but rather purely according to the intent he has ascribed to Defendants. According to Dr. Babul, Defendants refused to exercise the Warrant because of his alleged breach of fiduciary duties—which provided a logical connection to Relmada's claims in the underlying action—but they excluded him from the Share Exchange as part of their larger scheme to harm him currently before the Court.

I agree with Defendants that Plaintiff's argument proves too much and ultimately contradicts the heart of Dr. Babul's allegations in this action. "He cannot have it both ways." Defendants' Reply Brief at 3. Ironically, accepting the factual allegations as true, Defendants did not actually refuse to exercise the Warrant as a result of Dr. Babul's alleged breach of his fiduciary duties—as Plaintiff now suggests to differentiate his two contract claims—but rather as part of the larger conspiracy to harm him. Plaintiff pleads:

> The misconduct at issue here extended beyond the filing of and prosecution of a baseless lawsuit. Dr. Babul was the subject of malicious acts that were designed to punish, intimidate, and harm him, including the following: . . .
>
> d. Relmada cancelled Dr. Babul's warrants to purchase stock given to him solely as consideration for unpaid compensation of $690,250 . . .
>
> f. Defendants orchestrated the reverse merger and share exchange that create Relmada II but excluded Dr. Babul from sharing in the benefits.

Compl. at ¶ 31.

Furthermore, as pleaded in the Complaint, Relmada reported to the SEC that it excluded Dr. Babul from the Share Exchange as a result of the underlying action, which I view as the same reason that Relmada provided for canceling the Warrant. During argument, Plaintiff's counsel tried to distinguish between Relmada explicitly citing Dr. Babul's alleged breach of fiduciary duty as the reason for canceling the Warrant verses citing the lawsuit as the basis for refusing to include Dr. Babul in the Share Exchange as follows:

> [T]he court needs to compare it to the counterclaim that was asserted.  That was based on a January 29th letter revoking his warrant.  And in that letter, it said, because you breached your fiduciary duties as alleged in the Complaint, we're revoking your warrant. . . . But the claim based on the share exchange isn't based at all on the underlying alleged breaches of fiduciary duties.  There's nothing to suggest that.  That's never been said.  That's never been said anywhere.  It just said – in the SEC filing, it says, due to the under – ongoing litigation, we're not going to exchange the shares.  We never understood that to mean because of the alleged breaches, we have right to exclude you from the share exchange.

Argument Transcript at 39.  In defense counsel's words, "It is really, really sophistic to say that mentioning the litigation arising out of a fiduciary breach means that you're not relying on the fiduciary breach or that it doesn't come from a core of – common core of facts at the fiduciary breach."  Argument Transcript at 46.

I am convinced that Plaintiff's breach of contract claim arises out of the same "transaction or occurrence" as Relmada's claim in the underlying action.  Plaintiff's contract claim concerning exclusion from the Share Exchange clearly bears a logical relationship to Relmada's allegations that Dr. Babul breached his fiduciary duties.  The rule behind compulsory counterclaims aims to prevent "multiplicity of actions" and to resolve "disputes arising out of common matters" in a single lawsuit.  I have no question that it would have been more efficient to handle Plaintiff's two contract claims together in the earlier action.  At a minimum, Dr. Babul's concession that his two sets of counterclaims are "related" proves they are offshoots of the same basic controversy between the parties.

Plaintiff next argues that his current contract claim was not ripe during the pendency of the underlying action because shares in Relmada II were not yet trading publicly.  This argument inspired the following exchange with counsel during the hearing on this Motion.

> THE COURT: When would you say the claim for specific performance came ripe?

> [PLAINTIFF'S COUNSEL]: . . . right after they said they wouldn't do it in May – in – May 20, 2014.

20

THE COURT: All right.  And when [would] you say that the claim for damages became ripe?

[PLAINTIFF'S COUNSEL]: When there was public trading and there actually was damages.

THE COURT: And when would you fix that date?

[PLAINTIFF'S COUNSEL]: In March of 2015.

THE COURT: March of '15?

[PLAINTIFF'S COUNSEL]: Yes.

THE COURT: And the case in front of me settled in December '14.  Mr. Hangley, same questions to you.  When would you say that the specific performance claim became ripe [and the] damages claim?

[DEFENSE COUNSEL]: As soon as the decision was made not to [include Dr. Babul in the] exchange.  If he had a claim based on the exchange, he should have brought it then.  It was ripe then.
. . .
It is certainly going to become a quantifiable matter, but it has never been the law that you can't – that you don't have a cause of action, that a claim is not yet ripe, that the statute has not commenced running until you've got your damages precisely [calculated].

THE COURT: So you would say that – that at that point, Dr. Babul knew he had a right to damages, he just didn't know how much, and therefore that made the claim ripe at that point? . . .  Right.

Argument Transcript at 25–27.  I also agree with Defendants on this point.  Dr. Babul was on notice regarding his claim about the Share Exchange in May 2014.  He may not have been able to calculate the precise amount of damages, but he certainly had a ripe legal claim at the time he filed his amended answers and counterclaims in June of 2014.

Plaintiff cites Section 352 of the Restatement (Second) of Contracts as support for his argument that the claim was not ripe.  I construe that section as a general prohibition against speculative damages.  The principles it embodies are not controlling where it is the amount of

damages that are in dispute. On that score, it is striking that the underlying action settled in December 2014, and Plaintiff contends his damages became ripe in March 2015. Had the counterclaim been asserted, I would have expected settlement to be postponed until the claim was fully and fairly calculated. Indeed, "Dr. Babul was at all times in a position to demand equitable action or specific performance – the right to participate in the exchange – just as he claimed the right to have his canceled warrants reinstated." Defendants' Reply Brief at 6. "Essentially, Dr. Babul argues that he had a *larger* damages claim in March of 2015 and thus, of course, now he wishes to raise a purported claim he earlier decided to ignore when he did not recognize its possible value." Id. Simply put, it is indisputable that Dr. Babul's current demand for specific performance in the form of an injunction ordering the exchange of his shares could have been brought during the underlying action even if he had not calculated ascertainable damages at that time.[9]

Plaintiff makes one final argument regarding the status of his contract claim as compulsory. In a supplemental letter submission, Plaintiff argues that Defendants should be estopped from arguing that the contract claim is barred as a compulsory counterclaim because the parties exchanged communications on this very question in the summer of 2014 relating to the Delaware Chancery Court proceedings concerning counsel fees. Dr. Babul claims that he incurred fees investigating the Share Exchange and sought reimbursement, which Relmada

---

[9] Plaintiff also argued in his Opposition Brief that in order for a counterclaim to be compulsory, it must have matured before the original Answer to the original Complaint was filed, here being February 12, 2014. Dr. Babul therefore argues that his breach of contract claim for specific performance did not mature until Relmada's SEC filing on May 27, 2014, at the earliest, and his breach of contract claim for damages did not mature until Relmada II shares started trading publicly in March 2015, meaning that neither claim was ripe at the time he filed his *original* Answer in February 2014. However, as pointed out by Defendants, there does not appear to be any legal support for this argument, and counsel appeared to abandon this position at argument as a result, instead focusing on his argument that damages were merely speculative at the time of the underlying action. See In re Kaiser Grp. Int'l Inc., 399 F.3d 558, 568 (3d Cir. 2005) (" 'Maturity' as an element of Federal Rule of Civil Procedure 13(a) compulsory counterclaims is expressly set forth in the rule itself: 'A pleading shall state as a counterclaim any claim *which at the time of serving the pleading* the pleader has against any opposing party.' Fed.R.Civ.P. 13(a) (emphasis added).").

allegedly objected to on the basis that a claim relating to the Share Exchange was not in fact a

compulsory counterclaim.  Plaintiff further argues that Relmada's offers to exchange Dr. Babul's

shares following termination of the underlying action essentially served as acknowledgements

that the claim would not be barred in subsequent litigation as a compulsory counterclaim.  See

Plaintiff's September 23, 2015 Letter Brief ("[T]his communication demonstrates the lack of

merit to Relmada's position that Dr. Babul should have raised Count V in the prior litigation . . .

Otherwise, Relmada would have no reason to offer to exchange the shares now.").

I was not convinced by the equitable arguments raised in Plaintiff's Letter Brief and

discussed my concerns during oral argument.

> THE COURT: My understanding of Rule 13 is that it's a rule of judicial economy
> and that what we're really looking at is the court's time and conserving scarce
> judicial resources.  So why does the agreement of counsel as to what is or is not
> compulsory even matter when it's really a rule of judicial economy?  Help me out
> with that. . . .
>
> [PLAINTIFF'S COUNSEL]: Because it would be grossly unfair.
>
> THE COURT: So that's an estoppel argument.
>
> [PLAINTIFF'S COUNSEL]: Correct. . . .
>
> [DEFENSE COUNSEL]: We took the position that we shouldn't have to pay for
> all of the work he was doing with respect to what now emerges as the share
> exchange claim, which he hadn't filed.  It wasn't, obviously, a compulsory
> counterclaim because it wasn't a counterclaim at all at that time, and – and we
> said it wasn't.  Now Mr. Harvey, on the other hand, argued very vocally with
> respect to the position that the exchange claim was intimately bound to the same
> events that gave rise to the warrant refusal or warrant cancellation, and he argued
> at some great length to that in his papers –
>
> THE COURT: So you would argue that if there's estoppel, it goes against Dr.
> Babul –
>
> [DEFENSE COUNSEL]: Oh, absolutely.

Argument Transcript at 32–36.  I understand Plaintiff's estoppel argument and empathize with his frustration if Defendants truly took the opposite position in the summer of 2014 concerning Dr. Babul's contract claim.  However, any pleas concerning fairness have neutral impact at best, as the parties each advance the same equitable argument.  Regardless, in recognizing that Rule 13 is a rule of judicial economy, I find the communications between counsel in the Delaware Chancery Court action to be irrelevant to my analysis of whether Plaintiff's contract claim bears a logical relationship to the issues presented by Relmada's claims against Dr. Babul in the prior suit.  Accordingly, Plaintiff's contract claim is barred as a compulsory counterclaim that should have been brought in the underlying action.

### f.  Defendants' Motion to Strike

Defendants request in the alternative that the Court strike immaterial and impertinent paragraphs of the Complaint under Fed. R. Civ. P. 12(f).  They suggest that these allegations were only included to air Dr. Babul's various grudges against his former colleagues.  Defendants fear that Plaintiff will rely on the purported relevance of these allegations to conduct discovery into completely irrelevant facts.  Specifically, Relmada requests that the Court strike ¶¶ 60–61, 63–78, 81–96, and the first sentence of ¶ 21.

The allegedly irrelevant paragraphs concern the following topics: Dr. Babul's regrets about selling a majority stake in Relmada and dissatisfaction with the private placement agreements; allegations that Laidlaw claims to be 160-years-old when it is not; and Seth and Traversa's alleged character flaws.  Plaintiff maintains that ¶¶ 63–78 "were included to show that the [moving] Defendants' acts are part of a malicious and deceptive course of conduct that explains why and how they set out to extort [Dr. Babul] into surrendering his shares in Relmada in 2013 and 2014."  Plaintiff's Opposition Brief at 22.  The remaining allegations "were included

to show that Laidlaw and Seth acted fraudulently and with evil intent from the very beginning," and to "explain why Dr. Babul resigned and give context to the entire narrative."  Id.

In reviewing Plaintiff's Complaint and opposition papers to this Motion, there is no question that Plaintiff's language is often hyperbolic, sometimes to the point that it strains credibility.  I agree with Defendants that many of the identified paragraphs seem unnecessary, and Plaintiff might even be better served by curtailing his submissions to the Court in the future. However, I am mindful of the steep road ahead for Plaintiff in attempting to prove the ambitious allegations in the Complaint.  As a result, I hesitate to strike material that provides greater context to the alleged scheme, particularly allegations that relate to Defendants' alleged malicious intentions or character flaws that support an inference of malice.  Defendants' Motion to Strike is therefore denied.

I must emphasize that this decision should not be interpreted as a license for Plaintiff to abuse the discovery process in pursuit of a fishing expedition or as a method to harass or embarrass any of the Defendants in this matter.  Should discovery devolve and Defendants' fears be realized, they should not hesitate to promptly seek Court intervention.

**III.    Conclusion**

Based on the foregoing, Defendants' Motion is denied in part and granted in part.  An appropriate order follows.

_____/s/ Gerald Austin McHugh_
United States District Court Judge
