IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| NAJIB BABUL, : | |
| Plaintiff, : | |
| : | CIVIL ACTION |
| v. : | NO. 15-2937 |
| : | |
| RELMADA THERAPEUTICS et al., : | |
| Defendants. : | |

McHUGH, J.                                                                                               February 21, 2018

## MEMORANDUM

This case arises from a prior lawsuit for breach of fiduciary duty brought against Plaintiff Najib Babul by his former business partners after he resigned from his company, Defendant Relmada Therapeutics. That litigation terminated after the parties entered into a stipulated judgment. Plaintiff then filed this case for wrongful use of civil proceedings under Pennsylvania's Dragonetti Act. Defendants are Relmada; its board members, Sandesh Seth and Sergio Traversa; attorneys David Danovitch, David Burger, and their firm Robinson Brog [hereinafter "Attorney Defendants"]; and the financial entities involved in the company's restructuring, Laidlaw & Company and Jamess Capital Group [hereinafter "the Financial Entities"]. Plaintiff has also asserted a defamation claim against Relmada, and a civil conspiracy claim against the Financial Entities.

The parties have filed cross motions for summary judgment. Given the many factual issues raised by the record, Plaintiff's Motion for Summary Judgment will be denied. Defendants Relmada, Seth, and Traversa's Motions for Summary Judgment will also be denied. The Attorney Defendants' Motion is granted in its entirety. I will grant the Financial Entities'

Motion as to Plaintiff's Dragonetti claims against Jamess, but deny it as to Laidlaw.  Finally, Plaintiff's civil conspiracy claims against Jamess will be dismissed.

## I.  Pertinent Facts and Standard

I write only for the parties, and will therefore incorporate by reference the facts set forth in a Memorandum I issued earlier in this case.  *See* Mem. 2–7, ECF No. 35.  The parties' motions are governed by the well-established standard for summary judgment set forth in Federal Rule Civil Procedure 56(a), as amplified by *Celotex Corporation v. Catrett*, 477 U.S. 317 (1986).

## II.  Dragonetti Act Claim

Plaintiff's primary claim in this litigation arises under Pennsylvania's Dragonetti Act, a codification of the common law tort for wrongful use of civil proceedings.  The Dragonetti Act sets out the following elements:

> **(a) Elements of action.**  —  A person who takes part in the procurement, initiation or continuation of civil proceedings against another is subject to liability to the other for wrongful use of civil proceedings [sic]:
>> (1) he acts in a grossly negligent manner or without probable cause and primarily for a purpose other than that of securing the proper discovery, joinder of parties or adjudication of the claim in which the proceedings are based; and
>> (2) the proceedings have terminated in favor of the person against whom they are brought.

42 Pa. Cons. Stat. § 8351.  The statute also lays out a plaintiff's burden of proof.  The plaintiff must prove that:

> (1) The defendant has procured, initiated or continued the civil proceedings against him.
> (2) The proceedings were terminated in his favor.
> (3) The defendant did not have probable cause for his action.
> (4) The primary purpose for which the proceedings were brought was not that of securing the proper discovery, joinder of parties or adjudication of the claim on which the proceedings were based.
> (5) The plaintiff has suffered damages as set forth in section 8353 (relating to damages).

§ 8354. As the statute indicates, Plaintiff cannot succeed in maintaining a Dragonetti action without proving that the proceedings terminated in his favor, and that Defendants did not have probable cause to support the underlying litigation. I will address these two issues first before considering arguments unique to the Defendants' respective motions. I note at the outset that Plaintiff carries the burden of proving each of the five elements above. The party bearing the burden of proof rarely prevails on summary judgment. *Shager v. Upjohn Co.*, 913 F.2d 398, 403 (7th Cir. 1990).

**A. Termination in Plaintiff's Favor**

As a threshold question, I must determine whether the underlying litigation terminated in Plaintiff's favor. The Pennsylvania Superior Court has stated, "Generally, when considering the question of 'favorable termination' in a wrongful use of civil proceedings case, whether a withdrawal or abandonment constitutes a favorable, final termination of the case against who[m] the proceedings are brought initially depends on the circumstances under which the proceedings are withdrawn." *D'Elia v. Folino*, 933 A.2d 117, 122 (Pa. Super. 2007). If the underlying action terminated as a result of a settlement, or as a result of some other form of compromise, I would have to find as a matter of law that the action did not terminate in Plaintiff's favor. *See id.* ("[W]ithdrawal of proceedings stemming from a compromise or agreement does not, as a matter of law, constitute a termination favorable to the party against whom proceedings have been brought originally.").

On the other hand, Pennsylvania courts have recognized that that the voluntary dismissal of an underlying action may qualify as a favorable termination. In a case where a plaintiff voluntarily dismissed all claims on the eve of trial, the Pennsylvania Superior Court found that the abandonment of claims constituted a termination in the defendant's favor. *See Bannar v.*

3

*Miller*, 701 A.2d 242, 248 (Pa. Super. 1997). In *Robinson v. Robinson*, 525 A.2d 367 (Pa. Super. 1987), the Superior Court reached a similar conclusion. There, the plaintiff had sued her former husband in federal court for breach of a settlement agreement, and for various torts, including attempted rape. She then withdrew her tort claims in the federal action, reserving the right to re-assert the same claims in a separate action pending in New Jersey state court. She never amended her New Jersey complaint, effectively dropping the tort claims. Following resolution of the New Jersey action, her former husband counter-sued, contending that the tort claims had been baseless. The *Robinson* court held that, even though the parties had never litigated the tort claims, Mrs. Robsinon's failure to re-assert them after withdrawing them in the federal action could be deemed a termination in favor of her husband. *Id.* at 370–71. Specifically, the Court concluded that "there is no requirement that [favorable termination] be based upon the merits . . . ," expressing concern that "[a]ny other result would allow a party to initiate suit and then withdraw or abandon the claims before trial to as to escape potential liability." *Id.* at 371.

The underlying action that Defendants brought against Dr. Babul terminated through a stipulated judgment order. *See* Stipulated Judgment Order, *Relmada Therapeutics, Inc. v. Babul*, No. 14-cv-104 (E.D. Pa. Dec. 3, 2014), ECF No. 47 [hereinafter "Stipulated Judgment"]. The process leading to that stipulated judgement began with Relmada's Offer of Judgment pursuant to Rule 68 of the Federal Rules of Civil Procedure. *See* Att'y Defs.' Ex. 30, ECF No. 161-32. For practical purposes, the initial Offer of Judgment constituted Relmada's abandonment of its affirmative clams. Thereafter, following exchanges between the parties relating to Dr. Babul's counterclaims, judgement was ultimately entered in Plaintiff's favor "against Relmada on all claims in Relmada's Complaint . . . with costs taxed against Relmada." Stipulated Judgment ¶ 1.

In short, Relamada's initial Offer of Judgment proposed to terminate the litigation with Relmada receiving nothing, and upon final termination nothing is what it received.

The picture is clouded because Plaintiff had also asserted counterclaims in the underlying action. Before he left Relmada, the company had issued Dr. Babul a warrant for the purchase of Relmada shares as compensation for $894,850 owed to him for unpaid compensation and as reimbursement for funds he advanced to the company. *See* Seth Dep. 188:8–189:13, ECF No. 156-8; App. Ex. 96, ECF No. 156-18 ("Conversion Agreement, Consent and Release"). Dr. Babul in turn executed a release of all claims relating to his advances and deferred compensation. App. Ex. 96 § 1.4, ECF No. 156-18. In connection with the Conversion Agreement, Laidlaw required Plaintiff to enter an Escrow Agreement, joined by Relmada, through which Plaintiff placed fifty percent of his common stock and warrant in an escrow account. The agreement set forth performance milestones that Plaintiff would need to meet before the escrow agent could release the escrowed shares and warrant. App. Ex. 95, ECF No. 156-18. Though it is unclear why, Relmada cancelled Babul's warrant around the time it filed the underlying lawsuit. Traversa Dep. 17:1–19:23, ECF No. 156-6.[1] Through the counterclaims he asserted in the underlying action, Plaintiff sought to reinstate the warrant and to recover damages arising from Relmada's actions. First Am. Answer ¶¶ 31–54, *Relmada Therapeutics, Inc. v. Babul*, No. 14-cv-104 (E.D. Pa. June 25, 2014), ECF No. 22.[2]

---

[1] Traversa in his deposition could not recall why Relmada cancelled Dr. Babul's warrant. But Relmada offered an explanation in a January 29, 2014 letter it sent to Dr. Babul to notify him that it had cancelled the warrant. The letter explained that Relmada believed Plaintiff had not satisfied his duties as a company officer, in part by using company funds for personal expenses, and had not satisfied conditions necessary for him to retain the warrant, including helping the company reach a "Minimum Raise." *See* Compl. Ex. 7, ECF No. 1.

[2] Plaintiff sought relief consisting of a judgment (1) requiring Relmada to reinstate the warrant; (2) providing damages arising from cancellation of the warrant; (3) awarding attorneys' fees; and (4) declaring the warrants in compliance with federal securities laws. First Am. Answer 17–18.

Babul was unwilling to accept the Offer of Judgment without resolution of his counterclaims. Negotiations then ensued. *See generally* Att'y Defs.' Ex. 32, ECF No. 161-34. This leads the Defendants to argue that the underlying case must be deemed to have settled, with the result that Babul cannot claim a favorable termination. The fatal weakness in this argument is that all of the negotiations concerned the counterclaims. As to Relmada's affirmative claims, there was nothing left to negotiate after the Offer of Judgement. Technically, the Offer could be said to have expired when it was not accepted within 14 days. But nothing in the materials submitted suggests that any substantive discussion of Relmada's claims occurred during the period of negotiation that followed; the negotiations focused exclusively on Babul's counterclaims.

Defendants analogize this case to those involving consent judgments, and stress that the judgement entered was "stipulated." Those arguments are undercut by the sequence of events here, where the process began with what a jury might deem Relmada's surrender. Defendants also emphasize that in a petition for attorney's fees that Plaintiff filed with the Delaware Court of Chancery, Plaintiff's attorney, Albert Manwaring of Morris James LLP, described the underlying action as terminating in a "settlement," Att'y Defs.' Ex. 52, at 11, ECF No. 184-6, Att'y Defs.' Reply Br. 12–13, ECF No. 18, arguing that Babul is judicially estopped from contending otherwise. But Manwaring was not counsel in the underlying action, and the precise nature of the termination was not at issue in the proceedings. Moreover, while there was a settlement as to Babul's counterclaims, the same description does not readily apply to Relmada's case in chief.

This case presents a very close question. Pennsylvania courts, following the Restatement (Second) of Torts, have acknowledged that the favorable termination element of a Dragonetti action is largely a question of law for a court to decide. Yet, the jury retains the "function of

finding the circumstances under which the defendant acted." *Dravo Corp. v. Ioli*, 584 A.2d 1011, 1013 (Pa. Super. 1991) (citing *Miller v. Pennsylvania R. Co.*, 371 Pa. 308, 316, 89 A.2d 809, 812 (1952)). In *Dravo*, the court recognized that, where the "circumstances surrounding [the termination] are unclear," the fact-finder should determine "whether or not [the plaintiff in the underlying action] truly compromised their claim." *Id.* There, the Superior Court held that it was error to decide the question as a matter of law even where the underlying proceeding ended by means of the parties' joint motion for voluntary dismissal. Relmada is correct that there is substantial evidence supporting the conclusion that the burden of paying Babul's counsel fees made the litigation economically pointless. Br. of Relmada 41, ECF No. 155. But it asserted attorney-client privilege when counsel who proposed the offer of judgment was deposed, Pl.'s Br. Ex. C, at 166–67, ECF No. 173-3, and though it certainly had the right to do so, Babul is correct that this leaves unanswered questions as to the circumstances under which the case terminated. Because it is unclear from the facts whether Plaintiff entered a settlement or compromise with Relmada, I will deny both parties' motions for summary judgment on this issue.

**B. Probable Cause**

Plaintiff and Defendants have also moved for summary judgment on the question of probable cause. Both argue that this question is a matter of law for the court to decide. *See, e.g.*, *Meiksin v. Howard Hanna Co.*, 590 A.2d 1303, 1305 (Pa. Super. 1991) ("Absent material conflicts in the evidence, the presence or absence of probable cause is for the court to determine."). Considering the conflicting evidence before me, summary judgment is not a suitable mechanism for resolving this issue.

7

The Dragonetti Act sets out a definition for the term "probable cause" as used in Section 8351:

> A person who takes part in the procurement, initiation or continuation of civil proceedings against another has probable cause for doing so if he reasonably believes in the existence of the facts upon which the claim is based, and either:
> (1) reasonably believes that under those facts the claim may be valid under the existing or developing law;
> (2) believes to this effect in reliance upon the advice of counsel, sought in good faith and given after full disclosure of all relevant facts within his knowledge and information; or
> (3) believes as an attorney of record, in good faith that his procurement, initiation or continuation of a civil cause is not intended to merely harass or maliciously injure the opposite party.

§ 8352.

Based on this definition, I find that the record presents a factual dispute as to whether Defendants reasonably believed in "the existence of the facts" that formed the basis of the underlying complaint. The parties dispute whether Dr. Babul complied with his fiduciary obligations to make requested documents and information available to Relmada, and whether Defendants had evidence sufficient to justify their claim. *See* Br. of Relmada 35–39, ECF No. 155. There are too many unresolved issues to rule on probable cause as a matter of law.

Having addressed these threshold issues that are implicated by all of the pending motions, I will now consider issues unique to certain of the Defendants.

## C. The Attorney Defendants

The Attorney Defendants argue that they did not have an improper purpose in bringing the underlying lawsuit. In response, Plaintiff attempts to collapse the probable cause and improper purpose elements of Section 8351 into a single inquiry. According to Plaintiff, because the attorneys filed the complaint against Babul without probable cause, this provides evidence that they also acted with an improper purpose. *Miller v. St. Luke's Univ. Health Network*, 142

8

A.3d 884, *appeal denied*, 164 A.3d 479 (Pa. 2016); *Buchleitner v. Perer*, 794 A.2d 366 (Pa. Super. 2002); Pl.'s Omnibus Br. 39–42, ECF No. 173 [hereinafter "Pl.'s Br."]. Plaintiff relies upon decisions from the Pennsylvania Superior Court holding that an improper purpose may be "inferred" from a lack of probable cause, or inferred where an action is filed without "justification." *See Miller*, 142 A.3d at 898; *Buchleitner*, 794 A.2d at 377; *Broadwater v. Sentner*, 725 A.2d 779, 784 (Pa. Super. 1999).

In the context of a Dragonetti action brought against attorneys, courts should proceed with caution in attributing an improper purpose by means of inference. Pennsylvania courts have looked to the Second Restatement for guidance in interpreting the Dragonetti Act. *See, e.g.*, *Rosen v. Am. Bank of Rolla*, 627 A.2d 190, 192 (Pa. Super. 1993) ("The statutory definition of the tort is now in agreement with the Restatement (Second) of Torts, § 674."). The Restatement provides that when an attorney initiates a civil proceeding on behalf of a client, "even if he has no probable cause and is convinced that his client's claim is unfounded, he is still not liable if he acts primarily for the purpose of aiding his client in obtaining a proper adjudication of his claim." § 674 cmt. d. In other words, attorney liability requires more than mere lack of probable cause. To find otherwise would cut against the principle that an attorney can "safely act upon facts stated by their clients." *See Meiksin*, 590 A.2d at 1307 ("[Attorneys] do not incur liability to third persons for filing civil proceedings when the evidence of those facts is later found not credible by the court or jury whose duty it is to try the case. Any other rule would impair the quality of the representation which a client is entitled to receive from his lawyer.").

In his attempt to show that the Attorney Defendants had an improper purpose, Plaintiff calls upon the same facts supporting his argument that Relmada lacked probable cause in bringing the action. Pl.'s Br. 42. Plaintiff argues that Defendants had no evidence to support the

9

"core allegation" in the complaint they filed in the underlying litigation, and that Dr. Babul in a letter demonstrated the "clear business purpose for over half the $1.48 million." Pl.'s Mot. Summ. J. 47–48, ECF No. 156-2 [hereinafter "Pl.'s Mot."]. In further support, Plaintiff cites an admission from counsel during a hearing in the underlying litigation, in which Relmada's counsel stated that he had no independent evidence of improper expenditures, but that they were questionable "on their face." *See* Tr. of Mot. Hr'g 3:11–4:4, *Relmada Therapeutics, Inc. v. Babul*, No. 14-cv-104 (E.D. Pa. Oct. 16, 2014), ECF No. 40. This ignores the fact that counsel was proceeding on a complaint that had been verified by his clients.

Additionally, Plaintiff argues that the evidence shows Dr. Babul cooperating "extensively" with Defendants' requests. Pl.'s Mot. 49. Plaintiff notes that Robinson Brog attorney David Danovitch acknowledged in emails the existence of a strategy that Defendants had employed to get Dr. Babul to cooperate. For example, on October 10, 2013, in an email to Sergio Traversa commenting on an email from Dr. Babul, Danovitch wrote: "Let's see what comes out. I think the good cop/bad cop may be working." App. Ex. 25, ECF No. 156-11. About two weeks later, Danovitch also wrote to Traversa: "Checking in to see if you are making any progress with the softer approach. If not, let's regroup and see how to up the ante." App. Ex. 26, ECF No. 156-11. Finally, Plaintiff also references a comment from another Robinson Brog Attorney, David Burger, who questioned the strategy of filing a complaint for the full $1.48 million in expenses. In an email to Danovitch, Burger suggested that it would be difficult to justify the full value of questionable expenses in the complaint, noting that "[w]ithout any written policy, auto, rent, airfare and credit card expenses could be business expenses." He suggested limiting the complaint to specific amounts connected to $95,000 in loans and

$265,731 in wires, noting, "A $350,000 claim should be persuasive enough to get what you want." App. Ex. 30, ECF No. 156-12.

According to Plaintiff's theory of the case, what Relmada wanted was to force Babul to relinquish his ownership rights in the company. *See* Compl. ¶¶ 22, 32, ECF No. 1. Plaintiff therefore seizes on this exchange to attribute an improper purpose to counsel. This one exchange cannot bear the weight Plaintiff places upon it. In his deposition, Burger testified that what he meant was that suing for such a sum would be sufficient to get Babul to provide records and justifications for his expenses. Burger Dep. 95:5–8, 117:3–118:22, ECF No. 156-5. Danovitch testified that he believed Burger to mean the same thing. Danovitch Dep. 190:6–191:5, ECF No. 156-5.

To the extent that Relmada, Seth, or Traversa had an improper purpose of divesting Babul of his ownership interest, my close review of the record does not suggest that Danovitch, Burger, or any other Robinson Brog attorney was aware of it. The snippets of language on which Plaintiff relies—"good cop/bad cop" and "upping the ante"—are characteristic of the typical posturing in commercial litigation, and if overly aggressive statements of damages sufficed to establish an improper purpose, then this element would be rendered meaningless. Relmada contended that the expenses were improper and one of its officers was willing to attest to that in verifying the complaint. Even if probable cause were lacking, its attorneys cannot be liable absent evidence that they were pursuing the case for an improper purpose, which does not appear on this record.

### D. The Financial Entities

Laidlaw and Jamess have moved for summary judgment, arguing that they had no role in procuring, initiating, or continuing the underlying action. They are correct in arguing that the

record offers no evidence suggesting that either entity had any direct involvement in the litigation. Plaintiff, however, offers an alternative theory, arguing that because Laidlaw placed Seth on Relmada's board to represent its interests as a shareholder, the Financial Entities should be held vicariously liable for Seth's role in initiating the lawsuit. *See* Pl.'s Br. 40–41.

A claim for wrongful use of civil proceedings is more than a negligence action. By requiring a plaintiff to show that a litigant acted with an improper purpose, a Dragonetti claim amounts to an intentional tort. *See Regent Ins. Co. v. Strausser Enterprises, Inc.*, 902 F. Supp. 2d 628, 640 (E.D. Pa. 2012). Pennsylvania courts have contemplated the possibility that an employer could be vicariously liable for a malicious prosecution initiated by an employee, if the evidence shows that the employer either authorized the employee to act, or that the authority could be "legitimately inferred from the nature and scope of his employment." *See e.g.*, *Kirschman v. Pitt Pub. Co.*, 318 Pa. 570, 576, 178 A. 828, 830 (1935) (quoting *Markley v. Snow*, 207 Pa. 447, 451–52, 56 A. 999, 1000 (1904) ("Undoubtedly a principal may be held liable for the act of his agent in instituting a malicious prosecution. But the act of the agent becomes that of the principal only when expressly authorized, or when his authority to act may fairly be inferred from the nature and scope of the employment.")); *Valles v. Albert Einstein Med. Ctr.*, 569 Pa. 542, 551, 805 A.2d 1232, 1237 (2002) (recognizing that "a master may be held liable for the acts of the servant when those acts are committed during the course of his employment and within the scope of his authority," and that "[a] master may be vicariously liable even in the case of assaults committed by the servant").

The evidence here does not suggest that Laidlaw authorized Seth to initiate the lawsuit. The authority to initiate the underlying lawsuit, however, could be inferred from the nature of Seth's position as a Laidlaw representative acting as Relmada board member. I also find that the

12

record presents a question of fact as to whether Seth acted as an agent or employee of Laidlaw in his capacity as a Relmada board member. *See* Eitner Dep. 21:21–24:6, ECF No. 156-8. Because a jury could possibly find that Seth served as an agent of Laidlaw, and had authority in that capacity to initiate the underlying litigation, Laidlaw's motion for summary judgment is denied.[3]

The record, however, does not indicate that Jamess had any involvement in the underlying action. While Seth maintained fifty percent ownership of the company, Jamess had no role in directing Seth or any other party to file the underlying action. Jamess merely provided Relmada financial consulting services in connection with its Private Placement transaction. On these facts, I find no basis on which Jamess may be held liable for the underlying action, and therefore grant the Financial Entities' Motion for Summary Judgment only as to Jamess.

**E. Relmada, Sandesh Seth, and Sergio Traversa**

In their Motions to Dismiss, Relmada, Seth, and Traversa argue that Plaintiff has offered no evidence to show that it acted with an improper purpose. Relmada argues that the evidence shows that it brought the underlying action because "it had no other viable alternative to collect and analyze certain missing financial information which was necessary to close a public transaction and comply with SEC regulations." Br. of Seth and Traversa 5, ECF No. 154-1; Br. of Relmada 39–42, ECF No. 155. I find that the evidence is not entirely clear. Although the record is thin on direct evidence, Plaintiff has marshalled enough circumstantial evidence to raise a factual question about the existence of an improper purpose.

---

[3] Defendants argue that Plaintiff cannot raise a theory of liability that Plaintiff did not present in his complaint at this stage of the litigation. But while federal courts have found that failure to plead a vicarious liability claim in a complaint is fatal to such a theory at a later stage in litigation, *see, e.g.*, *Enslin v. Coca-Cola Co.*, 2017 WL 3727033, at *10 (E.D. Pa. 2017), the facts alleged in Plaintiff's Complaint here suggest the possibility that such a theory could be raised. I therefore find no reason to grant the Financial Entities' motion based on this argument.

Plaintiff's complaint hinges on the contention that Relmada intended to use the litigation not to receive an explanation for Plaintiff's expenses, but rather to extort him into relinquishing his ownership rights. Several facts might support this theory. First, by demanding a response by December 3, Defendants left Plaintiff with little time to reply to the November 27 letter requesting a business justification of all $1.5 million in questioned expenses. *See* App. Ex. 56, ECF No. 156-12. Second, as Plaintiff notes, Relmada ultimately succeeded in going public without any further cooperation from Dr. Babul, and its accountant, Douglas Beck, believed he had all records necessary to prepare an audited financial statement for the transaction. Pl.'s Mot. 50; App. Ex. 6, at 121:6–122:7, ECF No. 156-8. Third, the record indicates that Relmada had attempted to buy out Plaintiff's control of Relmada as part of a settlement offer to Babul in the underlying litigation. Danovitch Dep. 224:15–226:16.

These facts at least raise questions about Relmada's stated purpose in filing the underlying complaint, and give reason for Plaintiff to proceed with his Dragonetti claim against Defendants Relmada, Seth, and Traversa, as well as Laidlaw. Their motions will therefore be denied as to Plaintiff's Dragonetti claim.

## III. Defamation Claim

In addition to his claim for wrongful use of civil proceedings, Plaintiff has asserted a defamation claim against Relmada in response to disclosures it made in SEC filings. Relmada has argued that, because its SEC filing was subject to conditional privilege, it cannot be held liable for defamation. A conditional privilege arises when a defamatory statement involves an interest of a third party or the public. *Elia v. Erie Ins. Exch.*, 634 A.2d 657, 660 (Pa. Super. 1993). A corporate board member's communication to shareholders, for example, is subject to conditional privilege. *Simms v. Exeter Architectural Prod., Inc.*, 916 F. Supp. 432, 436 (M.D.

Pa. 1996). Similarly, an SEC filing contains information of interest to both the SEC and the public. Defendant is therefore entitled to invoke conditional privilege.

As Pennsylvania courts have made clear, however, conditional privilege is a defense only if it is not abused. It is clear that negligence in preparing a publication may indicate abuse of a conditional privilege in matters that are not of public concern. *Simms*, 916 F. Supp. at 436 ("Abuse of a conditional privilege is indicated when the publication is actuated by malice or *negligence* . . . .") (emphasis added); *Beckman v. Dunn*, 419 A.2d 583, 588 (Pa. Super. 1980) (same); *Baird v. Dun & Bradstreet*, 446 Pa. 266, 275, 285 A.2d 166, 171 (1971) (finding defendant's negligence in verifying the spelling of plaintiff's name in preparing a credit report sufficient to prove abuse of a conditional privilege). But a matter of public importance may demand a greater degree of culpability. *See, e.g.*, *Moore v. Vislosky*, 240 F. App'x 457, 463 (3d Cir. 2007) (finding that where a defamatory statement involves a matter of "public concern," a private-figure plaintiff must prove more than negligence); *Am. Future Sys., Inc. v. BBB*, 872 A.2d 1202, 1211 (2005), *aff'd* 592 Pa. 66, 923 A.2d 389 (2007) (holding that, because "the statements at issue related to consumer complaints and, therefore touched upon a matter of public concern," the defendant was "entitled to a conditional privilege in its publication of the reports," and that plaintiff therefore needed to "show more than mere negligence in the publication of the statements to defeat the conditional privilege . . .").

Here, even if Plaintiff must meet the higher standard, there is a potential basis on which to find abuse of privilege. If the jury were to accept the fundamental premise of Plaintiff's case, that the litigation was wrongfully pursued to strip Babul of his ownership interest, then necessarily there would be no justification for including allegations of wrongful conduct in the SEC filings. As to reputational harm, I am persuaded that the electronic after-life of Relmada's

15

accusations provide evidence from which a jury could find injury. Accordingly, Defendant Relmada's motion for summary judgment on the defamation claim will be denied.

## IV. Conspiracy Claim

Plaintiff has asserted a civil conspiracy claim against Jamess and Laidlaw, alleging that they conspired with Relmada and Robinson Brog to "procure, initiate, prosecute and continue" the underlying action in this case. Compl. ¶ 324; Pl.'s Br. 47–48. Preliminary, I would observe that, as with most civil conspiracy claims, it is not at all clear what this claim adds beyond the other claims asserted.

Under Pennsylvania law, a civil conspiracy claim requires a plaintiff to establish that "two or more persons combined or agreed with intent to do an unlawful act or to do an otherwise lawful act by unlawful means." *Thompson Coal Co. v. Pike Coal Co.*, 488 Pa. 198, 211, 412 A.2d 466, 472 (1979). The plaintiff must provide evidence of an overt act "done in pursuance of the common purpose." *Rutherfoord v. Presbyterian-Univ. Hosp.*, 612 A.2d 500, 508 (Pa. Super. 1992) (quoting *Baker v. Rangos*, 324 A.2d 498, 506 (Pa. Super. 1974)).

As to the Attorney Defendants and Jamess, this claim fails for the same reasons as the Dragonetti claim. As to Laidlaw and Relmada, Defendants are correct that "[a] single entity cannot conspire with itself and, similarly, agents of a single entity cannot conspire among themselves." *Rutherfoord v. Presbyterian-Univ. Hosp.*, 612 A.2d 500, 508 (Pa. Super. 1992) (citing *Wells v. Thomas*, 569 F. Supp. 426, 436 (E.D. Pa. 1983) and *O'Neill v. ARA Servs., Inc.*, 457 F. Supp. 182, 188 (E.D. Pa. 1978)). Plaintiff argues that Seth was simultaneously acting as a Relmada board member and head of healthcare investment banking at Laidlaw. Pl.'s Mot. 47. To the extent that is true, and to the extent that in wearing two hats Seth brought Laidlaw and

Relmada together for the improper purpose of divesting Babul of his ownership interest, it could be said that the two entities were acting in concert to violate the Dragonetti Act.

**V. Conclusion**

As to Plaintiff's Motion for Summary Judgement, the record in this case does not remotely approach the level of clarity or certainty that would be required to grant such unusual relief. As to Defendants' various motions, although Plaintiff's case is heavily dependent on inference, and there will certainly be a robust defense put before the jury, there is enough in the record to allow Plaintiff to proceed on some of his claims.

     /s/ Gerald Austin McHugh
United States District Judge